Case No. 25–30381

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

**Joy Banner, Doctor of Philosophy**

Plaintiff – Appellant,

**v.**

**Michael Wright, in his individual and official capacities; St. John the Baptist Parish; Jaclyn Hotard, in her individual and official capacities,**

Defendants – Appellees.

---

On Appeal from the United States District Court,
Eastern District of Louisiana,
Civil Action No. 2:23-CV-07296,
Honorable Nannette Jolivette Brown, Presiding

————————————————

## BRIEF OF THE APPELLANT

————————————————

William Most (No. 36914)
David Lanser (No. 37764)
MOST & ASSOCIATES
201 St. Charles Ave, Ste. 2500 #9685
New Orleans, LA 70170
Telephone: (504) 509-5023
williammost@gmail.com

*Counsel For Plaintiff-Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Dr. Joy Banner, Plaintiff-Appellant
2. William Most, Most & Associates, Counsel for Appellant
3. David Lanser, Most & Associates, Counsel for Appellant
4. Jaclyn Hotard, Defendant-Appellee
5. Michael Wright, Defendant-Appellee
6. St. John the Baptist Parish, Defendant-Appellee
7. Ike Spears, Counsel for Appellee
8. Joyce Sallah, Counsel for Appellee

*/s/ William Most*
William Most
*Counsel For Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Dr. Joy Banner respectfully requests oral argument in this matter. Appellant believes oral argument would be helpful in assessing and questioning the legal and factual questions at issue on appeal.

In particular, oral argument would help elucidate the impact of the dozens of rule violations and evidentiary violations committed by defense counsel during trial, which the trial court found "repeatedly crossed the bounds of proper advocacy," were "abusive," and made a "mockery" of the proceedings.

Oral argument would also be helpful in discussing the trial court's decision to deny a motion for a new trial on the basis of unsworn double hearsay – specifically, a newspaper's reporting about what one juror said about how *other* jurors reached their decision.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ................................................... 2

STATEMENT REGARDING ORAL ARGUMENT ...........................................3

TABLE OF CONTENTS ................................................................ 4

TABLE OF AUTHORITIES ............................................................ 6

JURISDICTIONAL STATEMENT ..................................................... 9

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .......................10

STATEMENT OF THE CASE ........................................................ 11

    I.    Factual Background ......................................................12

    II.   Procedural Background.................................................. 15

STANDARD OF REVIEW ........................................................... 20

SUMMARY OF THE ARGUMENT ................................................. 20

THE ARGUMENT...................................................................... 22

    A.   This Court should order a new trial because of the cumulative nature of Defendants' persistent misconduct at trial, including violations of the trial court's evidentiary rulings.............................................................. 22

    B.   This Court should order a new trial because the trial court's only basis for concluding that the misconduct did not affect the verdict was material excluded by F.R.E. 606 and the rules against double hearsay...........................41

    C.   This Court should order a new trial because the juror's quotation, if taken at face value, shows that the jury misapplied the legal standard......................45

D.  This Court should order a new trial because of the weight of evidence in Plaintiff's favor, including that Defendants admitted that they silenced the plaintiff during public comment (a) because of the content of her speech; (b) using a state law that had been declared unconstitutional nine years earlier; and (c) pursuant to an "on-topic" rule that did not exist. .....................................49

CONCLUSION..............................................................................................57

CERTIFICATE OF SERVICE........................................................................58

CERTIFICATE OF COMPLIANCE...............................................................59

# TABLE OF AUTHORITIES

## CASES

*Bailey v. Iles*,
87 F.4th 275 (5th Cir. 2023) ....................................................... 43, 46, 47

*Boos v. Barry*,
485 U.S. 312 (1988) .......................................................................... 53

*Chiu v. Plano Independent Sch. Dist.*,
260 F.3d 330 (5th Cir. 2001) ............................................................ 52

*Encompass Office Sols., Inc. v. La. Health Serv. & Indem. Co.*,
919 F.3d 266 (5th Cir. 2019) ............................................................ 46

*Hartman v. Moore*,
547 U.S. 250 (2006) .......................................................................... 45

*Heaney v. Roberts*,
846 F. 3d 795 (5th Cir. 2017) ........................................................... 53

*Hodgkins ex rel. Hodgkins v. Peterson*,
355 F.3d 1048 (7th Cir. 2004) .......................................................... 46

*Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*,
772 F.3d 1031 (5th Cir. 2014) ................................................. 23, 38, 39

*Izen v. Catalina*, 3
98 F.3d 363 (5th Cir. 2005) .............................................................. 45

*Keenan v. Tejeda*,
290 F.3d 252 (5th Cir. 2002) ............................................................ 46

*King v. Caldwell ex rel. La., AG*,
21 F. Supp. 3d 651 (E.D. La. 2014) .................................................. 15

*Matal v. Tam*,
582 U.S. 218 (2017) .......................................................................... 52

*Nat. Rifle Association v. Vullo*,
144 S. Ct. 1316 (2024) .................................................................. 46, 48

*Rodriguez v. Riddell Sports, Inc.*,
242 F.3d 567 (5th Cir. 2001) ............................................................. 47

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) ........................................................................ 52

*Sims v. City of Jasper*,
117 F.4th 283 (5th Cir. 2024) ........................................................... 23

*Smith v. Transworld Drilling Co.*,
773 F.2d 610 (5th Cir. 1985) .......................................................... 23, 49

*United States v. Bowen*,
799 F.3d 336 (5th Cir. 2015) ............................................................. 20

*United States v. Cervantes*,
706 F.3d 603 (5th Cir. 2013) ............................................................. 23

*United States v. Chapman*,
851 F.3d 363 (5th Cir. 2017) ............................................................. 41

*United States v. Curry*,
497 F.2d 99 (5th Cir. 1974) .............................................................. 41

*United States v. Deason*,
 622 F. App'x 350 (5th Cir. 2015) (per curiam, unpublished) ................................ 41

*United States v. Neuman*,
505 F. App'x 308 (5th Cir. 2013) (per curiam, unpublished) ................................ 41

*United States v. Pratt*,
807 F.3d 641 (5th Cir. 2015) ............................................................. 20

## STATUTES

28 U.S.C. § 1291 ................................................................................ 9

28 U.S.C. § 1331 ................................................................................ 9

28 U.S.C. § 1367(a) ........................................................................... 9

42 U.S.C. § 1983 ................................................................................ 9

R.S. 42:1141.4(L)(1) ........................................................................ 14

## OTHER AUTHORITIES

8 Wigmore §2340 (McNaughton Rev. 1961) ............................................ 41

Fryer, Note on Disqualification of Witnesses, Selected Writings on Evidence and
Trial 345 (Fryer ed. 1957) ............................................................... 41

Maguire, Weinstein, et al., Cases on Evidence 887 (5th ed. 1965) ......... 41

Wright, Federal Courts 633 (4th ed. 1983) ........................................... 49

## RULES

Fed. R. App. 4(a)(4)(A)(v) .................................................................. 9

Fed. R. Civ. Pro. 59(b) ....................................................................... 9

Fed. R. Evid. 606(b)(1) ..............................................................passim

Fed. R. Evid. 805 ............................................................................ 43

E.D. La. L.R. 47.5 ............................................................................ 44

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it is a suit brought under 42 U.S.C. § 1983. It had jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because Plaintiff is appealing a final decision of a district court of the United States. *See* ROA.2034 (Judgment), ROA.2593 (Order Denying Motion for New Trial). The following dates are relevant to the timeliness of this appeal:

- On January 29, 2025, the trial in this matter ended. ROA.2001.

- On February 4, 2025, the trial court issued a judgment. ROA.2034.

- On February 18, 2025, Plaintiff filed a motion for new trial. ROA.2042.

- On June 26, 2025, the trial court denied Plaintiff's motion for new trial. ROA.2593.

- On July 2, 2025, Plaintiff filed a notice of appeal. ROA.2610.

As these dates show, Plaintiff filed her motion for a new trial within twenty-eight days of the judgment, making it timely per Fed. R. Civ. Pro. 59(b). And Plaintiff filed her notice of appeal within 30 days of the denial of the motion for a new trial, making her appeal timely per Fed. R. App. 4(a)(4)(A)(v).

## <u>STATEMENT OF THE ISSUES PRESENTED FOR REVIEW</u>

1.      Should this Court remand for a new trial given the dozens of rule violations and evidentiary violations by defense counsel at trial, which the trial court found "repeatedly crossed the bounds of proper advocacy," "abusive," and a "mockery" of the proceedings?

2.      Should this Court remand for a new trial when the trial court denied the motion for a new trial based on evidence explicitly forbidden by Fed. R. Evid. 606(b)(1): the unsworn, double hearsay of a newspaper article's quotation of how one juror characterized other jurors' decision-making?

3.      Should a new trial be ordered when the one juror's statement, if taken at face value, shows that the jury fundamentally misapplied the legal standard?

4.      Should a new trial be ordered given that defendants admitted at trial that they silenced the plaintiff during public comment (a) because of the content of her speech; (b) using a state law that had been declared unconstitutional nine years earlier; and (c) pursuant to an "on-topic" rule that did not exist?

## STATEMENT OF THE CASE

This is a free speech case about two government officials who ordered Plaintiff Dr. Joy Banner ("Banner") to stop speaking during the public comment period of a public meeting, threatening her with imprisonment under a long-declared unconstitutional state law for talking about a governmental ethics issue.[1]

During the trial of this matter, defense counsel engaged in persistent misconduct, filling the trial with dozens of violations of the trial court's evidentiary rulings and engaging in behavior that the trial court found to be "abusive" and making a "mockery" of the issues.

Despite agreeing that defense counsel's conduct "repeatedly crossed the bounds of proper advocacy,"[2] the trial court relied on only a single piece of evidence to conclude that defense counsel's "misconduct did not materially affect the outcome of the trial": a newspaper's statement of what one juror said about how the *other* jurors decided.[3] But such evidence is categorically impermissible under Fed. R. Evid. 606.

Given defense counsel's misconduct and the weight of evidence in Plaintiff's favor, this Court should remand for a new trial.

---

[1] Later, Dr. Banner discovered that the piece of paper government official read the state law from even had the word "unconstitutional" at the top. ROA.3156.

[2] ROA.2608.

[3] ROA.2608-2609.

I.     **Factual Background**

This case involves a November 28, 2023 public meeting of the St. John the Baptist Parish Council in Louisiana. On the agenda that night was an item sponsored by the Parish President, Defendant Jaclyn Hotard ("Hotard"), to use parish funds to pay a private lawyer "to perform services related to Ethics Laws."[4] The agenda said:

> J) Jaclyn Hotard – Authorization to retain Legal Service with the Law Firm, R. Gray Sexton, as special Counsel, to perform services related to Ethics Laws subject to the restrictions imposed by the State of Louisiana regarding Ethics Procedures and at the rate in accordance with the Attorney General Guidelines per statute.[5]

There was only one ethics issue facing the Parish at that time – an ethics complaint filed by Dr. Banner.[6]  Dr. Banner is a community leader in St. John the Baptist Parish who had frequently participated in public meetings for several years. She was especially concerned with corruption issues in her home parish.

Earlier in 2023, Dr. Banner had filed an ethics complaint about President Hotard alleging that Hotard signed an industrial rezoning application for land adjacent Dr. Banner's home.[7] The ethics problem was that Louisiana law prohibits a public official from participating in a decision that would financially benefit their

---

[4] ROA.3143-3145.
[5] ROA.3144-3145.
[6] ROA.2224.
[7] ROA.2004 (Stipulated Facts).

immediate family.[8] And here, the rezoning directly affected the value of the property of an LLC owned in part and operated by Hotard's mother-in-law.[9]

At the November 28, 2023 meeting, Dr. Banner approached the podium during the public comment period to express her point of view about agenda item J, that it would be an inappropriate use of taxpayer funds to retain the legal services of a private law firm to defend President Hotard against the ethics charge.[10]

Moments after beginning her comment, Hotard and Defendant Michael Wright began interrupting Dr. Banner. First, President Hotard interjected to say that Dr. Banner's comments were a "violation of state law" and asked the chair to "stop this comment."[11] Defendant Michael Wright, the Council Chair, gaveled Dr. Banner to be quiet and told her that she must speak about a specific agenda item. Dr. Banner attempted to explain why her comments were on-topic (because she was directly speaking to agenda item J, whether private ethics counsel should be hired) but, after a back-and-forth with Hotard and Wright, Wright again gaveled to silence her. Wright then read to Dr. Banner verbatim from a state law (R.S. 42:1141.4(L)(1)):

It shall be a misdemeanor punishable by a fine of not more than $2000

---

[8] *See id.*

[9] *See id. See also* ROA.2246 ("Q. Thank you. And the value of that land would have increased if the rezoning were approved; correct? A. Correct.").

[10] ROA.2005 (Stipulated Facts); ROA.2115 ("And if she made that error, then she should be accountable for her error and her alone. I believe it's unfair to make public taxpayers have to pay for her personal representation.").

[11] ROA.2005 (Stipulated Facts).

or <u>imprisonment for not more than one year</u> or both for any member of the Board of Ethics, it's Executive Secretary, other employee or any other person other than the person who is subject to the investigation or complaint to make public the testimony taken at a private investigation or private hearing of the Board of Ethics or to make any public statement or give out any information concerning a private investigation, private hearing of the Board of Ethics without the written request of the public servant or other person investigated.[12]

Fearing the prosecution threatened by Defendant Wright, Plaintiff prematurely ended her comment and returned to her seat, without using the poster board or materials she brought with her to the lectern.[13] Several other individuals who came to speak on the agenda item also decided not to comment out of fear of prosecution.[14]

In the weeks after, Dr. Banner learned that the law that Wright had threatened her with had been declared unconstitutional by a federal court nine years earlier.[15] Through a public records request, Dr. Banner obtained a copy of the piece of paper

---

[12] *Id.*

[13] ROA.2120 ("THE COURT: Did you ever get to make your point that you were trying to make? THE WITNESS: No, no." . . . Q. Did you ever get a chance to use that map during your public comment? A. No."); ROA.2120-2121 ("Q. Did you have an opportunity to distribute those handouts? A. No, I did not."); ROA.2122 ("Q. And did you get a chance to discuss the reason why you brought that board? A. No, I didn't get a chance to."); *id.* (Banner explaining she was not able to get to "the most important point that I wanted to make.").

[14] ROA.2189 (Banner's mother: "Q. You just chose not to speak after what you saw with your daughter; correct? A. Yes. . . . I leaned over, and I told my husband that I don't think that we should speak, and really.").

[15] ROA.2005 (Stipulated Facts) ("IN 2014, A FEDERAL JUDGE DETERMINED THAT 'R.S. 42:1141.4(L)(1) IS INVALID, BOTH AS APPLIED TO THESE PLAINTIFFS AND ON ITS FACE, AT LEAST IN PART.'"), referring to *King v. Caldwell ex rel. La., AG*, 21 F. Supp. 3d 651, 656 (E.D. La. 2014).

Wright had read the statute from – and discovered that it even had the word "Unconstitutional" at the top.[16]

Having been silenced during public comment by threat of imprisonment under a long-declared-unconstitutional law, Dr. Banner decided to bring a lawsuit for the violation of her freedom of speech.

## II.   **Procedural Background**

On December 14, 2023, Dr. Banner filed suit, bringing federal law claims under 42 U.S.C. § 1983, and state law claims under Louisiana's Constitution and Open Meetings Law.

On February 2, 2024, Defendants filed a Motion to Dismiss for failure to state a claim and lack of jurisdiction.[17] The trial court denied the motion.[18]

On November 26, 2024, Dr. Banner filed a Motion for Partial Summary judgment on her Open Meetings Law claim, contending that the fact that Defendants' actions violated the law's requirement of an open "public comment period" when they directed her to stop speaking, gaveled her quiet, and then threatened her with arrest and prosecution under a long-declared-unconstitutional

---

[16] ROA.2228 ("Q. So this piece of paper had the word 'unconstitutional' at the top of it; is that correct? A. Yes.").

[17] ROA.98 *et seq.*

[18] ROA.236 *et seq.*

statute.[19] Defendants also filed a cross-motion for partial summary judgment on the Open Meetings Law claim.[20] Both motions were denied.[21]

In discovery, Dr. Banner requested text messages between President Hotard and Hotard's mother-in-law about Dr. Banner and the rezoning. President Hotard responded by falsely swearing under oath that "no such documents exist."[22] Hotard's perjury was discovered when Hotard's mother-in-law was asked for the same documents and turned over more than a hundred responsive text messages.[23]

In the texts, Hotard and her mother-in-law discussed at length the rezoning project, the value of the property, and Dr. Banner in particular. Hotard wrote about how she feels "hate" towards Banner,[24] called Banner a "bitch,"[25] shared Banner's financial information,[26] and fantasized about choking Banner.[27] The text messages also showed the lengths that President Hotard had gone to silence Dr. Banner. For example, President Hotard had instructed her Director of Communications, Baileigh Helm, to "cancel all advertising" with a newspaper that printed a letter to the editor

---

[19] ROA.1131 *et seq.*
[20] ROA.1212 *et seq.*
[21] ROA.1838 *et seq.*
[22] ROA.1266 *et seq.*
[23] ROA.1287 *et seq.*
[24] ROA.1272.
[25] ROA.1272.
[26] ROA.1270.
[27] ROA.1272.

from Dr. Banner.[28] And just a few weeks before the November 2023 meeting, Hotard explicitly indicated that she wouldn't let Dr. Banner talk about the ethics issue: she said she would accept "anything, but to let them say I violated the ethics code."[29]

Discovery also revealed a family "secret" that shed light on President Hotard's motivation for preventing Dr. Banner from speaking.[30] The secret was that in addition to President Hotard's mother-in-law, President Hotard's *husband* also had a financial interest in the rezoning that was the subject of Dr. Banner's comments at the public meeting.[31]

On January 27, 2025, Dr. Banner's claims went to trial. During the trial, Dr. Banner's team put on strong evidence in her favor, including admissions from Defendants that they silenced her based on the content of her speech,[32] that the Parish had never actually adopted the "on-topic rule" that was Defendants' primary defense for their conduct,[33] that Hotard had privately called Banner "the bitch"[34]

---

[28] ROA.1270.

[29] ROA.2238. Emphasis added.

[30] ROA.1710; ROA.1776.

[31] ROA.1710 ("Q. So the parish president's husband is one of the beneficiaries of one of the trusts that owns Gaumet Holdings, LLC? A. Yes."); ROA.1766 ("Q. Okay. So that's been a secret until today? A. It's been a secret until you all – until the judge ruled I had to give it to you, yes.").

[32] ROA.2226 ("Q. Okay. So it was because of the content of what she was saying that you took the actions that you did; correct? A. She was getting off topic, yes.").

[33] ROA.2405 (Q. Sure. When you gaveled her quiet, it was to enforce a rule that the parish has never formally adopted; agreed?  A. Correct.").

[34] ROA.2237 ("Q. And you understood Ms. Hotard, when she said "the bitch," to mean Joy Banner; correct? A. I'm guessing that's what she meant.").

and fantasized about choking her, [35] and that Hotard had privately said she would accept "anything, but to let them say I violated the ethics code."[36]

Defense counsel, by contrast, offered an array of persistent rule violations. This began in opening statements, when the trial court had to sustain multiple objections to defense counsel falsely representing the law. And then during witness testimony, defense counsel engaged in more than a dozen violations of the trial court's evidentiary rulings, including a premeditated attempt to introduce prohibited evidence of advice-of-counsel. Defense counsel also engaged in treatment of witnesses that the trial court found to be "abusive"[37] and making a "mockery"[38] of matters, and had to be cautioned at least a dozen times that trial counsel are not themselves allowed to testify. These violations are detailed in the chart in section A(2), infra.

The jury returned a verdict for defendants.[39] After the trial, one juror gave a statement to a newspaper suggesting that the jury had applied the wrong legal standard.  Dr. Banner filed a motion for leave to interview the jurors according to a

---

[35] ROA.2237 ("Q. So your understanding of the text message was that Ms. Hotard was saying she wanted to choke Joy Banner; correct? A. It was my understanding, yes.").

[36] ROA.2238. Emphasis added.

[37] ROA.2154.

[38] Id.

[39] ROA.2029.

specified protocol.[40] Defendants opposed the motion, arguing that "just because one of the jurors is speaking to the media – on his own volition – does not create any interest that would outweigh the whole jurors' interest in privacy and the public's interest in well-administered justice."[41] The trial court denied the motion.[42]

On February 18, 2025, Dr. Banner filed a motion for a new trial. Although Defendants had opposed the motion to interview the jurors, they now argued that the juror's statement was the *most important* factor regarding the motion for a new trial.[43]

On June 26, 2025, the trial court denied the motion for a new trial.[44] The trial court cited the juror's statement in the newspaper as the only basis for concluding "that defense counsel's misconduct did not substantially influence the jury, and the jury's verdict was reasonably supported by the evidence" – even though the juror's statement in the newspaper was unsworn double hearsay.[45]

On July 2, 2025, Dr. Banner filed a notice of appeal.[46]

---

[40] ROA.2035 *et seq.*
[41] ROA.2041.
[42] ROA.2520.
[43] ROA.2528 ("Additionally, *most importantly*, a member of the jury has actually been speaking, on his own behalf, about how the jury came to their unanimous verdict." Emphasis in original).
[44] ROA.2593.
[45] ROA.2609.
[46] ROA.2610.

## STANDARD OF REVIEW

In reviewing a district court's order denying a motion for a new trial, this Court applies an abuse of discretion standard by which it reviews questions of law under a *de novo* standard and upholds the district findings of fact unless they are "clearly erroneous." *United States v. Pratt*, 807 F.3d 641, 645 (5th Cir. 2015), *citing United States v. Bowen*, 799 F.3d 336, 349 (5th Cir. 2015)

## SUMMARY OF THE ARGUMENT

This Court should order a new trial because of defense counsel's persistent misconduct during trial. That misconduct included more than a dozen violations of the trial court's evidentiary rulings, treatment of witnesses that the trial court found to be "abusive" and making a "mockery" of the issues, and more than a dozen instances in which defense counsel had to be stopped from testifying themselves. *See* chart, *infra*. During trial, the trial court judge indicated she was "really bothered" by the misconduct and was "not quite sure if [her] instruction corrected that. Sometimes when things are said, you know, they're out there."[47]

Dr. Banner moved for a new trial. The trial court agreed that defense counsel's conduct "repeatedly crossed the bounds of proper advocacy."[48] But the trial court

---

[47] ROA.2370.
[48] ROA.2608.

concluded that defense counsel's "misconduct did not materially affect the outcome of the trial." The trial court's only basis for that conclusion, however, was one item of unsworn double hearsay: a newspaper's statement of what one juror said about what the *other* jurors said.[49] The trial court denied the motion for a new trial.

The trial court's denial of the motion for a new trial should be reversed for several reasons.

First, because the trial court's <u>only</u> basis for concluding that "defense counsel's misconduct did not substantially influence the jury, and the jury's verdict was reasonably supported by the evidence" was a single juror's statement in the newspaper about how he and the other jurors thought about the case. But Fed. R. Evid. 606(b)(1) categorically forbids courts from considering such evidence – even if it were not also unsworn double hearsay.

Second because even if taken at face value, the juror's quotation shows that the jury failed to follow the jury instructions and the legal standard set out by this Court.

And third, because the great weight of evidence was in Dr. Banner's favor, including Defendants admitting at trial that they silenced the plaintiff during public comment (a) because of the content of her speech; (b) using the threat of

---

[49] ROA.2608-2609.

imprisonment under a state law that had been declared unconstitutional nine years earlier; and (c) pursuant to an "on-topic" rule that did not exist.

Accordingly, this Court should remand for a new trial.

## THE ARGUMENT

**A.    This Court should order a new trial because of the cumulative nature of Defendants' persistent misconduct at trial, including violations of the trial court's evidentiary rulings.**

This Court has held that a new trial should be granted if "the trial was unfair, or prejudicial error was committed in its course." *Sims v. City of Jasper*, 117 F.4th 283, 288 (5th Cir. 2024), *quoting Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). When assessing a motion for a new trial based "on the submission of prejudicial information to the jury" the question is whether "the error did not influence the jury, or had but very slight effect.'" *Hollybrook Cottonseed Processing, L.L.C. v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 1034 (5th Cir. 2014) The test is this: if "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected" – and a new trial should be granted. *Id.* at 1034.

In assessing this, courts often look to the cumulative nature of the erroneous actions. *See, e.g., United States v. Cervantes*, 706 F.3d 603, 619 (5th Cir. 2013) ("The

cumulative error doctrine provides for reversal when an aggregation of non-reversible errors, *i.e.*, plain and harmless errors that do not individually warrant reversal, cumulatively deny a defendant's constitutional right to a fair trial.") And even just one sufficiently prejudicial element can warrant a new trial. *Hollybrook*, *supra*, 772 F. 3d 1031 (5th Cir. 2014) (upholding a grant of a new trial when counsel violated a motion *in limine* by eliciting a single piece of barred testimony.)

    1. According to the trial court, defense counsel "repeatedly crossed the bounds of proper advocacy," by making false statements of law, violating evidentiary rulings, offering the testimony of counsel, and otherwise making a "mockery" of the proceedings.

Here, defense counsel's persistent misconduct permeated the entire trial. It began in the first minutes of the defense's opening statement, when the trial court repeatedly had to sustain objections that defense counsel was falsely arguing the law. For example, defense counsel argued that R.S. 42:1141.4(L)(1) "is the law" and that Dr. Banner had acted "contrary to this confidentiality statute."[50] But the parties had stipulated that that law was determined to be "invalid" nine years earlier.[51] The trial court sustained an objection, and directed that some of defense counsel's comments be "withdrawn."[52]

---

[50] ROA.2091.
[51] ROA.1976 (Pre-Trial Order stipulation that in 2014, a federal judge determined that "R.S. 42:1141.4(L)(1) is invalid, both as applied to these plaintiffs and on its face, at least in part.").
[52] ROA.2092.

But despite the sustained objection, defense counsel *immediately* continued with the same argument – which resulted in another sustained objection and required the trial court to issue a curative instruction that the jury should "disregard" defense counsel's statement that talking about the ethics complaint "was contrary to the law or unlawful in any way."[53] (Despite the trial court's admonitions, the confidentiality statute ultimately became the main thrust of Defendants' closing argument to the jury.)

Defense counsel's misconduct continued into the examination of witnesses, when defense counsel had to be instructed not to testify at least twelve separate times.[54] On one occasion, defense counsel tried to engage in active (but transparent) deceit of the court. He told a witness "You and I previously went through deposition testimony. . ." before an objection was stated.[55] When the trial court pointed out that a lawyer cannot just launch into testifying about the content of a witness' deposition, defense counsel said "I'm not even talking about the deposition, Judge."[56] But of course, the trial court had a real-time transcript and pointed out that he "just did."[57]

---

[53] ROA.2093.
[54] ROA.2138-2139, ROA.2149-2152.
[55] ROA.2299-2300.
[56] ROA.2300.
[57] *Id.*

Defense counsel continued lines of questioning even when an objection was sustained and the trial court instructed him to "move on." For example, defense counsel asked Dr. Banner if she has run for office and "been soundly not voted by the people in your community who know you best?"[58] The trial court sustained an objection and ordered defense counsel to "move on." But defense counsel did not move on – he continued with the same questioning.[59] The trial court had to sustain another objection because defense counsel refused to move on as directed.[60]

Defense counsel engaged in conduct that the trial court determined to be "abusive" and a "mockery" of matters. During Dr. Banner's testimony, defense counsel pulled out a timer and said:

> I'm going to use this timer, and give us your speech right now, the exact speech you came prepared to say that you said you were stopped from saying by Michael Wright. Are you ready?[61]

Plaintiff's counsel objected, and at a bench conference the trial court said "I'm not going to allow you to make a mockery of the speech . . . I think that's abusive. . . I think that is just, you know, abusive of this woman to be honest with you."[62] The

---

[58] ROA.2145-2146.
[59] *Id.*
[60] *Id.*
[61] ROA.2154.
[62] *Id.*

trial court went on to explain that "I'm not going to make a witness come in here and perform. That is unheard of."[63]

2. Defense counsel engaged in repeated violations of this Court's evidentiary rulings.

The above misconduct was repeated and problematic. But likely the most prejudicial to a fair trial were defense counsel's repeated evidentiary ruling violations.

The most serious of these was defense counsel's premeditated violation of the trial court's ruling about the advice-of-counsel defense.[64] In a motion *in limine*, plaintiff's counsel pointed out that Defendants had talked with Assistant District Attorney Keith Green about the unconstitutional statute. Dr. Banner moved to exclude any discussion of that fact at trial because advice-of-counsel was an affirmative defense that had not been plead and because Mr. Green's input would not qualify as advice-of-counsel even if that defense had been plead.[65] The trial court granted the motion.[66] But then at trial, the following exchange occurred:

[Defense Counsel:]     But explain to the jurors what, if anything, did you do in preparation for that meeting?

---

[63] ROA.2156.

[64] ROA.738.

[65] ROA.387 *et seq.*

[66] ROA.740 ("Any reference to "advice of counsel" is excluded from the trial in this matter.").

[Mr. Wright:]          I spoke with — I had an email and a phone call from District Attorney Keith Green.[67]

Plaintiff's counsel immediately asked to approach the bench and objected on the basis that this was "the exact thing that this court excluded."[68] It quickly became apparent that this was a premediated violation of the trial court's order because defense counsel approached the bench with a printed memo listing the four elements of an advice of counsel defense.[69]

The trial court noted that the precise email Mr. Wright referred to had been excluded in pre-trial rulings.[70] Astonishingly, defense counsel admitted that he was attempting to put into evidence what Wright heard from District Attorney Green even though (1) the court had excluded that and (2) defense counsel *agreed* that it "absolutely does not" meet the elements of advice of counsel.[71] The trial court concluded that defense counsel was trying to "get in the backdoor what I did not allow you to present in the front door."[72]

---

[67] ROA.2381.

[68] ROA.2381.

[69] *Cf.* ROA.2381 (referring to sheet in hand, and saying "Your Honor, advice of counsel requires four specific things.").

[70] ROA.2382.

[71] ROA.2383 ("THE COURT: So you're agreeing? You said that his testimony doesn't meet the elements of advice of counsel? MR. SPEARS: Right, it absolutely does not.").

[72] ROA.2386.

The trial court articulated why this was so problematic: if Wright were able to testify that he got information from his attorney, then the "assumption is that he was advised by his attorney. . . And then the average person is going to say that, well, that's reasonable to read it because you got it from your attorney. But that's the defense that you did not properly raise. . . you want to weaponize the fact so that the jury can make the conclusion that he had advice of counsel without having the burden of actually having to prove it."[73]

The trial court therefore excluded any further questioning on this topic. But by that point, the damage was done: the jury had already heard about Mr. Wright's "email and a phone call from District Attorney Keith Green." There was no putting that genie back into the bottle.

That was only one of many evidentiary-ruling violations by defense counsel. Some of these consisted of defense counsel's repeated efforts to question non-expert, non-lawyers about what the law is. This began with the very first witness, and the trial court admonished defense counsel not to continue such conduct:

> THE COURT: Counsel, she is not an attorney, and I'm not going to allow her to try to opine on the law. I will instruct the jury on what the law is, what the Open Meetings Law is.
>
> We're here to present the facts to the jury. So if there's some facts that you need her to answer, if there's a question you can ask her that can

---

[73] ROA.2387-2388.

get her to respond in facts and not on the law, I'm going to allow you to proceed, but within those parameters.[74]

Despite being told not to question witnesses about the law, defense counsel continued to do so – over and over and over again. For example, with *the very next witness*, defense counsel asked Dr. Banner's mother a series of at least five legal questions about the Parish's compliance with the Open Meetings Law.[75] Some of these questions consisted of <u>defense counsel</u> testifying about the law, explaining what the law "means," and then asking the witness to agree or not. For example:

> Q. And finally, the Louisiana Open Meetings Law requires public bodies to have open meetings. That means that the public has to be there to observe it. Are you aware of that?[76]

It is obviously improper for counsel to say what the law "requires" and what the law "means" in front of the jury, and it is particularly improper to do so *after the court instructed counsel not to*. Even so, defense counsel continued to question witnesses about their "legal position"[77] and who the "statute applies to" over repeatedly sustained objections.[78] Defense counsel asked Defendant Wright if a person was

---

[74] ROA.2167.
[75] ROA.2192.
[76] ROA.2194.
[77] ROA.2331-2332.
[78] ROA.2333.

"violating any confidentiality statute,"[79] and he even asked a lawyer-witness what they "would advise" a person.[80]

At the outset of day two, the trial court issued guidance about Banner's ethics complaint against Hotard. Specifically, the trial court ruled that the dismissal of the ethics complaint was not material, because the Board of Ethics' reasoning was undisclosed and because the dismissal came long after the events in question. The trial court explained:

> We know there was an ethics complaint. We know it was dismissed. Why or why not really doesn't matter. It was dismissed. And the letter doesn't say why it was dismissed; so I'm not sure who knows why it was dismissed. But it doesn't matter. It's not a material fact in this case.[81]

But defense counsel refused to abide by the trial court's directive. They *continued* to repeatedly question multiple witnesses about the dismissal of the ethics complaint[82] and then returned again to it in closing.[83] In closing, he even said that

---

[79] ROA.2376.

[80] ROA.2334.

[81] ROA.2201.

[82] ROA.2334 ("Q. And the fact is that the complaint made against Jaclyn Hotard was thoroughly investigated, reviewed, and dismissed with no ethics violations found; is that correct?"); *id.* ("And the letter which you have identified by your signature says no violation was found; correct?"); ROA.2364 ("Can you tell the ladies and gentlemen of the jury what was the final outcome of that matter?"); ROA.2365 ("Q. What was the final outcome of that matter? A. What was the final outcome of that matter? The Ethics Board informed Ms. Hotard directly that she had not violated the ethics code and the file was closed."); *id.* ("Q. On which correspondence? A. The notice that the file was being closed because there was no evidence of a violation of the ethics code.").

[83] ROA.2497 ("That letter says that the Board of Ethics considered a confidential investigation and that the matter was closed and no violation of the Code of Governmental Ethics was found.").

things like the outcome of the ethics investigation were "important . . . extremely important."[84]

On the second day of trial, the trial court discussed an anticipated witness, Mr. Gray Sexton. It was unusual that Mr. Sexton was listed as a witness, given that he was a lawyer who represented two of the three defendants – the Parish and Ms. Hotard.[85] Before Sexton testified, the trial court set some ground rules: it was "not going to let [Sexton] testify" about his understanding of what was confidential or not.[86] Defense counsel committed that "We're not raising that issue, Judge."[87] Later, at a sidebar, Defense counsel said again that he "won't ask that."[88] But then Defense counsel asked *exactly* that, asking Mr. Sexton about the "investigative portion" of the ethics matter and about his "personal knowledge" of what was or was not "marked confidential."[89] The trial court stopped defense counsel and expressed the problem:

> What I'm really concerned about is you said you weren't going to ask that question and you turned around and asked that very question.

---

[84] ROA.2496.

[85] ROA.2369 ("Q. I just wanted to be clear who you represented. You represented Jaclyn Hotard; correct? A. That is correct and the parish.").

[86] ROA.2205 ("Then Defendants, you want to call Gray Sexton. Okay, he knew he was, you know, he's a lawyer, but I'm not going to let him testify that he always understood the Ethics Board's investigation to be confidential because it does not matter what he believed. You didn't stipulate, but you did not oppose Plaintiff's motion early on that there was no defense of — advice of counsel defense.").

[87] *Id.*

[88] ROA.2365 (Defense counsel "I won't ask that. I won't ask that.").

[89] *Id.*

Don't do that again. You asked the very question I was telling you do not ask because now they have this opinion. I'm going to have to have an opinion from someone who is not an expert.[90]

The trial court had to give the jury another curative instruction, and had to strike both defense counsel's question and Mr. Sexton's response.[91]

The trial court cautioned defense counsel not to use the word "inappropriate" to describe Dr. Banner's comment, because it suggested that the comment was "unlawful" when that was not true.[92] But despite the trial court's guidance, defense counsel continued to use the word "inappropriate" in that context.[93]

The trial court directed defense counsel not to question witnesses about the "internal operations of the Board of Ethics."[94] But within a minute, defense counsel was doing exactly that, asking the witness "if and when an ethics complaint involving an elected official comes to your attention, what steps do you take?"[95]

---

[90] ROA.2366-2367.

[91] ROA.2367-2368.

[92] ROA.2317-2318 ("I will also say that I'm starting to get a little cringe using the word, you know, something inappropriate, you know, was said in that meeting. So I would kind of caution you on saying that. If it's off topic, it's off topic. There's an issue. The jury will decide, I guess, if it's — if it was inappropriate or — because that sounds like it was unlawful, you know, because that's a whole other issue that we really don't have to — nobody has to decide.").

[93] ROA.2401 ("And the fact that she may have been addressing, as you thought to be, inappropriate, confidential ethics matters, was that one of your motivations to tell her to stay on topic?").

[94] ROA.2320 ("MR. MOST: So the internal operations of the Board of Ethics is off limits? THE COURT: Exactly.")

[95] ROA.2322.

The trial court directed defense counsel not to ask a non-expert witness about the reasons why something is "important."[96] But then <u>two questions later</u>, defense counsel asked the witness about "reasons why it's important to keep people on time."[97]

The trial court summarized this as "defense counsel repeatedly cross[ing] the bounds of proper advocacy."[98] Defense counsel's misconduct was so persistent and widespread that it is best summarized in chart form, organized by category of misconduct:[99]

| Defense Counsel's Violations of Evidentiary Rulings | | |
|---|---|---|
| 1 | The trial court excluded any evidence of advice of counsel, including communications with Assistant District Attorney Keith Green. But then defense counsel solicited testimony from Defendant Wright about his "email and a phone call from District Attorney Keith Green." | ROA.738-740, ROA.2381 |
| 2 | The trial court ruled that the parties could not ask legal questions of witnesses. Defense counsel did so with the very next witness. | ROA.2167, ROA.2192-2194. |

---

[96] ROA.2349.

[97] ROA.2350.

[98] ROA.2608.

[99] This list is by no means a full list of every sustained objection at trial. Many additional objections were sustained, but were less prejudicial to a fair trial. (*E.g.,* defense counsel eliciting irrelevant but benign testimony, questioning on cross outside the scope of the direct, or leading witnesses even after being directed not to.)

| | | |
|---|---|---|
| 3 | Despite the trial court's ruling about not asking legal questions, defense counsel asked witness Guillot about her "legal position." | ROA.2331-2332 |
| 4 | Despite the trial court's ruling about not asking legal questions, defense counsel asked witness Guillot about who the "statute applies to." | ROA.2333 |
| 5 | Despite the trial court's ruling about not asking legal questions, defense counsel asked lawyer-witness Guillot what she "would advise" a person. | ROA.2334 |
| 6 | Despite the trial court's ruling about not asking legal questions, defense counsel asked witness Landeche whether Parish actions were "in compliance with the Open Meetings Law." | ROA.2342 |
| 7 | Despite the trial court's ruling about not asking legal questions, defense counsel questioned witness Landeche about what the Open Meetings Law "requires" and whether the parish "complied" with the law. | ROA.2353-2354 |
| 8 | Despite the trial court's ruling about not asking legal questions, defense counsel asked Wright about whether Ms. Perriloux was "violating any confidentiality statute." Jury told to disregard. | ROA.2376 |
| 9 | The trial court ruled that the dismissal of the ethics complaint was already in evidence and "not a material fact in this case." But defense counsel questioned witness Guillot about it on cross. | ROA.2201, ROA.2334-2335 |
| 10 | Despite the trial court's ruling, defense counsel questioned witness Sexton about the dismissal of the ethics complaint. | ROA.2364-2365 |
| 11 | Despite the trial court's ruling, defense counsel questioned witness Guillot about the dismissal of the ethics complaint again on direct. | ROA.2330 |

| | | |
|---|---|---|
| 12 | Despite the trial court's ruling, defense counsel brought up the dismissal of the ethics complaint again in closing – and said it was "extremely important." | ROA.2496 |
| 13 | The trial court ruled that it "not going to let [Mr. Sexton] testify" about his understanding of what was confidential or not. But then, as the trial court explained, defense counsel "turned around and asked that very question." | ROA.2205, ROA.2365-2367 |
| 14 | The trial court cautioned defense counsel against using the word "inappropriate" to describe Dr. Banner's public comment because it would suggest that the comment was unlawful. But defense counsel continued using the term. | ROA.2317-2318, ROA.2401 |
| 15 | The trial court directed defense counsel not to question witnesses about the "internal operations of the Board of Ethics." But defense counsel did so within a minute with witness Landry. | ROA.2320-2322 |
| 16 | Defense counsel also questioned witness Guillot about the internal operations of the Board of Ethics. | ROA.2328-2330 |
| 17 | Despite the trial court's ruling that defense counsel shouldn't ask about "prominent supporters" of the industrial project, defense counsel continued to do so. | ROA.2378, ROA.2413-2414 |
| **Defense Counsel's False or Improper Statements About the Law** | | |
| 18 | In opening, defense counsel argued that R.S. 42:1141.4(L)(1) "is the law" – even though it was determined to be unconstitutional nine years prior. Comment ordered "withdrawn." | ROA.2092 |
| 19 | In opening, defense counsel argued that Plaintiff's actions were "contrary to the statute" – even though the statute | ROA.2092-2093 |

| | was unconstitutional. Jury told to "disregard" counsel's statement. | |
|---|---|---|
| 20 | Defense counsel asked a non-expert witness about the "reasons why it′s important to tell the public to stick to agenda items only." The trial court directed counsel not to ask a question like that of a non-expect. But defense counsel continued anyway, asking next "why it′s important to keep people on time." | ROA.2349-2350 |
| **Defense Counsel Testifying** | | |
| 21 | The trial court pointed out that counsel's question was "like testimony" when he said "everyone, except for you, seems to say that the only property, the only tracts of land that were in this new zoning application, the one that you wrote the ethics complaint about, was property belonging to Greenfield." | ROA.2138-2139 |
| 22 | Instead of asking a question, defense counsel stated that "First of all, Jaclyn Hotard is not the secretary to the parish council." The trial court had to say "I'm going to stop you from testifying." | ROA.2149 |
| 23 | Instead of asking a question, defense counsel stated that "First and foremost, the Open Meetings Law requires that the agenda . . ." Court had instructed defense counsel to "Stop testifying." | ROA.2150-2151 |
| 24 | Instead of asking a question, defense counsel stated that "you also saw that a couple other people — and if you don′t recall, I can show you the video of the meeting." Court instructed defense counsel that "You have to ask a question. You′re testifying." | ROA.2188-2189 |
| 25 | Defense counsel began to provide himself Ms. Gaudet's answer to a deposition question. Court instructed defense counsel "You can′t testify for her. You have to ask her a | ROA.2254 |

| | | |
|---|---|---|
| | question. And stop reading the deposition. She is here live to testify live." | |
| 26 | Defense counsel in his next question continued to provide testimony about the deposition. Court instructed defense counsel "You can't refer to her deposition. You have to ask her a question because you're not impeaching her." | ROA.2255 |
| 27 | Despite the trial court's orders, defense counsel testified about the requirements of the Open Meetings Law: "Q. The meetings, to be compliant with the Louisiana Open Meetings Law, must have some time period in which the public can discuss items that the council is going to vote on. Was that always done?" | ROA.2287 |
| 28 | Despite the trial court's orders, defense counsel began to testify about what "we concluded" in Ms. Guillot's deposition. | ROA.2300 |
| 29 | Despite the trial court's orders, defense counsel testified about what letters are or are not stamped confidential, prompting trial court to say "you're testifying again." | ROA.2324 |
| 30 | Despite the trial court's orders, defense counsel testified that Mr. Wright's "testimony is you did not notice or read the particular note" Court ruled: "Counsel, you can't testify for him. And you can't lead your own witness either." | ROA.2396 |
| 31 | Despite the trial court's orders, defense counsel testified that "I saw you cleared the chamber on the video." | ROA.2398 |
| 32 | Despite the trial court's orders, defense counsel testified that facts were "falsely alleged by Ms. Banner." Jury told to disregard. | ROA.2400 |

| 33 | Despite the trial court's orders, defense counsel testified that Ms. Hotard's reelection "seems like an incredible vote of confidence." Jury told to disregard. | ROA.2410 |
|---|---|---|
| **Defense Counsel Making a "Mockery" of Matters** | | |
| 34 | Defense counsel pulled out a timer and said "I'm going to use this timer, and give us your speech right now, the exact speech you came prepared to say that you said you were stopped from saying by Michael Wright. Are you ready?" | ROA.2154-2156 |
| **Irrelevant, Potentially Prejudicial Material Elicited by Defendants' Counsel** | | |
| 35 | Defense counsel asked Plaintiff whether "at least twice in recent history you have sought to do what Michael and Jaclyn has done which is put your name on the ballot to be elected, and you've been soundly not voted by the people in your community who know you best?" Defense counsel instructed to "move on" – but he did not. | ROA.2145 |
| 36 | Immediately after a sustained objection, defense counsel continued: "Did you run for office in 2014" | ROA.2145-2146 |
| 37 | Defense counsel asked witnesses about other lawsuits filed by Plaintiff's non-profit. | ROA.2293-2295 |
| 38 | Defense counsel tried to indicate to the jury that the judge "know[s] I'm slow," prompting a curative instruction to the jury. | ROA.2294-2297 |
| 39 | Even after the trial court overruled an objection, defense counsel continued to engage in a "talking objection" that could "influence what the witness would say." | ROA.2358 |

These thirty-nine examples paint a picture of a trial permeated by and repeatedly derailed by defense counsel misconduct. Compare the situation here to

that of *Hollybrook Cottonseed,* 772 F. 3d 1031 (5th Cir. 2014). In that case, this Court upheld a grant of a new trial when counsel violated a motion *in limine* by eliciting a single piece of barred testimony. The violation of the motion *in limine* was found to require a new trial, even though the court gave an immediate curative instruction and polled the jury for assurance that the jurors could ignore the improper evidence.

Here, the case presents repeated violations of motions *in limine* and a vast cumulative weight of other prejudicial statements, testimony by counsel, forbidden questions, etc. The trial court even recognized in real-time the cumulative nature of these violations, explaining at a sidebar that because defense counsel was "signaling bad law to the jury," the court therefore had a "list of other things I'm going to have to instruct the jury about."[100]

The question posed by this Court is whether it can be said "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error[s]." [101] If the answer is no, then "it is impossible to conclude that substantial rights were not affected" and a new trial should be granted.[102] Given the dozens of examples of repeated, pervasive, and court-order-violating conduct by defendants, there can be

---

[100] ROA.2208.
[101] *Hollybrook, supra*, at 1034.
[102] *Id.*

no fair assurance that the jury's judgment was not swayed. Although there were curative instructions to disregard certain statements, the sheer number of instructions to disregard made it nearly impossible for any juror to keep track of what testimony was or was not struck.

And in fact, the trial court expressed in real time that it could <u>not</u> say with fair assurance that the curative instructions were effective. After witness Sexton's testimony, the trial court explained:

> THE COURT: The concern I have is that there was some of this last lawyer's testimony that I'm really bothered about. <u>I'm not quite sure if my instruction corrected that</u>. Sometimes when things are said, you know, they're out there. And I don't want — and I'm really bothered, Mr. Spears, because I warned you not to ask the question. You asked the question. And so now, you know, the information is out there.[103]

Given the cumulative weight of the evidentiary and other violations, the inability of curative instructions to repair the repeated damage, and the trial court's contemporaneous assessment that there was no assurance that the damage had been repaired, this Court should remand for a new trial.

---

[103] ROA.2370. Emphasis added.

**B.**    **This Court should order a new trial because the trial court's only basis for concluding that the misconduct did not affect the verdict was material excluded by F.R.E. 606 and the rules against double hearsay.**

Federal Rule of Evidence 606(b)(1) flatly prohibits a court from receiving "evidence of a juror's statement" regarding "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." The notes to Rule 606 explain that "authorities are in virtually complete accord in excluding the evidence." *Citing* Fryer, Note on Disqualification of Witnesses, Selected Writings on Evidence and Trial 345, 347 (Fryer ed. 1957); Maguire, Weinstein, et al., Cases on Evidence 887 (5th ed. 1965); 8 Wigmore §2340 (McNaughton Rev. 1961).

So too with hearsay: generally, the Fifth Circuit has rejected attempts for courts to decide motions for new trials on the basis of inadmissible hearsay. In *United States v. Deason,* this Court held that a proffered affidavit was "inadmissible hearsay and cannot be used to obtain a new trial." 622 F. App'x 350, 360 (5th Cir. 2015) (per curiam, unpublished). Similarly, in *United States v. Chapman,* this Court held that "a motion for new trial may not be based on inadmissible evidence," and that "hearsay evidence is not material" to a motion for a new trial when it is "not admissible." 851 F.3d 363, 382 (5th Cir. 2017). And in *United States v. Neuman,* the

Court reiterated that a "motion for a new trial may not be based on inadmissible hearsay." 505 F. App'x 308, 309 (5th Cir. 2013) (per curiam, unpublished); *see also United States v. Curry*, 497 F.2d 99, 101 (5th Cir. 1974) (affirming denial of motion for new trial that was only on the basis of an "affidavit containing hearsay").

Here, in the order denying the motion for a new trial, the trial court agreed with plaintiff that "defense counsel repeatedly crossed the bounds of proper advocacy." ROA.2608. But the trial court concluded that "the Court finds that any such misconduct did not materially affect the outcome of the trial." *Id.* The trial court pointed to only one item to support that conclusion: one juror's "public interview with a local news station." *Id.* The trial court cited the newspaper's reporting of juror Cam Owens' statement:

> Cam Owen, one of the jurors, said that deliberations heavily relied on a video recording of the disputed public meeting. He said that Banner was able to communicate her points to the officials, even as the St. John leadership interrupted her. "They did try to stop her, but she actually did say what she had to say," Owen said. "We didn't vote no because the defense gave a good case. We voted no because the facts weren't there for the claims that the plaintiffs have."[104]

The trial court went on to explain that "[b]ased on Cam Owen's statements, the Court concludes that defense counsel's misconduct did not substantially

---

[104] ROA.2608-2609.

influence the jury, and the jury's verdict was reasonably supported by the evidence." ROA.2609.

As described in the next section, if the juror's statement is given evidentiary value it should <u>support</u> a grant of a new trial, because it shows that the jury applied the wrong standard by looking to whether Banner was totally and completely silenced (not the standard) rather than whether the threats would chill the speech of a person of ordinary firmness (the standard).[105]

But it should not be given evidentiary value. First, because Owens' statements about his and the other jurors' "mental processes concerning the verdict" is prohibited by Fed. R. Evid. 606(b)(1). There is no exception that would allow the trial court to receive such evidence, much less allow it to be the sole basis for affirming the sufficiency of the verdict. Defendants did not give any explanation for why they offered such evidence in violation of Rule 606(b)(1); and the trial court did not give any explanation for receiving it and using it as the only evidence for denying the motion for a new trial.

And second, because Owens' statements are unsworn double hearsay: it is the newspaper saying out of court what Mr. Owens said out of court about what the other

---

[105] *See Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023); *see also* ROA.2018 (Jury Instruction No. 11: Plaintiff must prove that "Defendants' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity").

jurors said. (And parts of it are the newspaper's *paraphrasing* of Mr. Owens' comments.)

For the newspaper quote to be admissible, each part of it would have to fall within an exception to the rule against hearsay. *See* Fed. R. Evid. 805 (Hearsay Within Hearsay). But here, neither the defendants nor the trial court pointed to a hearsay exception that might apply to any part of the newspapers' article.[106]

The trial court's reliance on a newspaper's quote and paraphrase of what one juror said about how the other jurors decided is particularly unfair here because the trial court previously denied Plaintiff's request to interview the jurors.

The Eastern District of Louisiana has a local rule prohibiting attorneys from speaking with jurors "except with leave of court."[107] After the trial but before the motion for a new trial, Dr. Banner filed a motion for leave to interview the jurors according to a specified protocol.[108] Dr. Banner specifically pointed out that "at least one juror has already voluntarily spoken to the media regarding the verdict" and that other jurors might also be willing to discuss the matter.[109]

Defendants opposed the motion, arguing that "just because one of the jurors is speaking to the media – on his own volition – does not create any interest that

---

[106] ROA.2593-2609 (trial court order); ROA.2525-2530 (defendants' brief).
[107] See E.D. La. L.R. 47.5, copied in full at ROA.2522.
[108] ROA.2035 *et seq.*
[109] ROA.2036.

would outweigh the whole jurors' interest in privacy and the public's interest in well-administered justice."[110] The trial court denied the motion.[111]

But in responding to the motion for a new trial, Defendants turned around and argued that the juror's statement was the *most important* factor.[112] And then the trial court used the newspaper's reporting about the juror's statement as the only basis for its conclusion "that defense counsel's misconduct did not substantially influence the jury, and the jury's verdict was reasonably supported by the evidence."[113]

It is fundamentally unfair for a trial court to (1) deny a party permission to interview jurors, and then (2) rely on reporting about one juror's statements as the sole basis for concluding that misconduct did not influence the jury and the verdict was supported by evidence. It is especially improper given that such evidence is categorically excluded by Fed. R. Evid. 606(b)(1). Accordingly, this Court should remand for a new trial.

## C.  This Court should order a new trial because the juror's quotation, if taken at face value, shows that the jury misapplied the legal standard.

The law is "settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including

---

[110] ROA.2041.
[111] ROA.2520.
[112] ROA.2528 ("Additionally, *most importantly*, a member of the jury has actually been speaking, on his own behalf, about how the jury came to their unanimous verdict." Emphasis in original).
[113] ROA.2609.

criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256, (2006). The Fifth Circuit has explained that any "form of official retaliation for exercising one's freedom of speech, including prosecution, <u>threatened prosecution</u>, bad faith investigation, and legal harassment, constitutes an infringement of that freedom." *Izen v. Catalina*, 398 F.3d 363, 367 n.5 (5th Cir. 2005) (emphasis added). In other words, the "First Amendment prohibits government officials from relying on the 'threat of invoking legal sanctions and other means of coercion . . . to achieve the suppression' of disfavored speech." *See Nat. Rifle Association v. Vullo*, 144 S. Ct. 1316, 1327 (2024). And the "Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004) (collecting cases).

To establish a First Amendment retaliation claim, a plaintiff must prove elements including that "defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Bailey v. Iles*, 87 F.4th 275, 289 (5th Cir. 2023), *quoting Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). That is to say, the plaintiff need not be completely silenced – just that they were threatened enough that a person of reasonable firmness would stop speaking.

When there is an indication that the jury is applying the wrong legal standard in deliberations, a new trial may be appropriate. *See Encompass Office Sols., Inc. v. La. Health Serv. & Indem. Co.*, 919 F.3d 266, 276 (5th Cir. 2019) (indication that "the erroneous legal standard was front and center in deliberations" supported granting of new trial); *see also Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 577 (5th Cir. 2001) ("If it is impossible to tell whether a correct theory has been used, we reverse for a new trial.")

Here, it was improper for the trial court to rely on the double hearsay of a juror's statement. But even if that statement is relied on and taken at face value, it does not weaken the argument for a new trial – it strengthens it. That is because the juror's statement, if taken as true, shows that the jury applied the wrong legal standard.

The newspaper's quotation of juror Cam Owens said the following about how the jury analyzed the case: "They did try to stop her, but she actually did say what she had to say." ROA.2608. Thus, according to Mr. Owens, the jury agreed that Defendants tried to stop Dr. Banner from speaking, but concluded that Dr. Banner was actually able to speak despite Defendants' efforts to silence her. On that basis the jury denied the First Amendment claim.

But that is the wrong legal standard. The First Amendment legal standard does not ask whether a particular plaintiff was actually and completely silenced; it asks instead whether Defendants' actions caused Plaintiff to suffer an injury that would chill <u>a person of ordinary firmness</u>. That is the legal standard in the law[114] as well as in the trial court's jury instructions.[115] (Additionally, the juror's conclusion that Dr. Banner said everything she had to say was factually false.[116])

Indeed, the United States Supreme Court reaffirmed just last year that the key analysis is the nature of the government actor's threat, not the impact on a particular listener. *See Nat. Rifle Association, supra,* 144 S. Ct. at 1326 (2024) ("In such cases, it is 'the application of state power which we are asked to scrutinize.'")

Thus, the juror's statement that Defendants "did try to stop her" shows that the First Amendment violation *was* proven – if the threats would chill the speech of a person of ordinary firmness, which all the evidence suggested they did.[117]

---

[114] *Bailey, supra,* 87 F.4th at 289.

[115] ROA.2018 (Jury Instruction No. 11: Plaintiff must prove that "Defendants' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity").

[116] ROA.2120 ("THE COURT: Did you ever get to make your point that you were trying to make? THE WITNESS: No, no." . . . Q. Did you ever get a chance to use that map during your public comment? A. No."); ROA.2120-2121 ("Q. Did you have an opportunity to distribute those handouts? A. No, I did not."); ROA.2122 ("Q. And did you get a chance to discuss the reason why you brought that board? A. No, I didn't get a chance to."); *id.* (Banner explaining she was not able to get to "the most important point that I wanted to make.").

[117] ROA.2124 (Dr. Banner: "I was in shock. I was terrified. I could not believe, never before has my name and imprisonment been used in the same sentence. I took it very seriously. Again, I thought that I had messed up. I thought how am I going to explain this to my parents. How am I going to

As a result, if this Court considers the juror's quotation in the newspaper, it should see that the jury applied the wrong legal standard and remand for a new trial.

**D.     This Court should order a new trial because of the weight of evidence in Plaintiff's favor, including that Defendants admitted that they silenced the plaintiff during public comment (a) because of the content of her speech; (b) using a state law that had been declared unconstitutional nine years earlier; and (c) pursuant to an "on-topic" rule that did not exist.**

According to the jurisprudence of this court, the judicial "power to grant a new trial on the basis of the court's firm belief that the verdict is clearly contrary to the weight of the evidence" has "long been regarded as an integral part of trial by jury." *Smith v. Transworld Drilling Co.,* 773 F.2d 610, 613 (5th Cir. 1985), *citing* Wright, Federal Courts 633 (4th ed. 1983).

In making this determination, a court "weighs all the evidence, but need not view it in the light most favorable to the nonmoving party." *Id.* While "the court is to respect the jury's collective wisdom and must not simply substitute its opinion for the jury's," if a court is not satisfied with the verdict of a jury, it "has the right -- and indeed the duty -- to set the verdict aside and order a new trial." *Id.*

---

explain it to my attorneys? Again, I was afraid that I was going to be arrested and jailed for speaking about something that I shouldn't speak of."); ROA.2182 (Banner's mother: "Q. Were you afraid as you were witnessing that, that your daughter might go to jail? A. Yes, I was."), ROA.2189 (Banner's mother: "Q. You just chose not to speak after what you saw with your daughter; correct? A. Yes. . . . I leaned over, and I told my husband that I don't think that we should speak, and really.").

Here, Dr. Banner brought claims under the First Amendment and Louisiana's Open Meetings Law, based on Defendants' actions during her attempt at public comment at a public meeting.

At trial, Defendants conceded that Parish President Jaclyn Hotard had sponsored an agenda item about the parish paying for ethics lawyers with taxpayer money.[118] There was only one identified ethics law issue at the time – an ethics complaint against Hotard herself.[119] But the fact of Hotard's ethics complaint was hidden from everyone, including the councilmembers who were being asked to vote on the item.[120]

When Dr. Banner attempted to speak about that agenda item and express the point of view that taxpayer money should not be spent on Hotard's ethics lawyers, Defendants acted to silence her. Hotard asked Wright to "stop Dr. Banner's

---

[118] ROA.2222-2223 (Wright Testimony) ("Q. All right. And at that 2023 meeting, there was an agenda item about hiring special ethics lawyers; correct? A. Yes. Q. And the agenda item was about the parish paying for those lawyers; correct? A. Yes. Q. With taxpayer money? A. Yes.").

[119] ROA.2224 (Wright Testimony) ("Q. Do you recall that you answered this question in a deposition? And do you recall that you were asked, 'But as far as you knew at the time, you only knew of one ethics law issue, the one involving the ethics complaint against Jaclyn Hotard'; agreed? A. Agreed. So I have no reason to dispute that.").

[120] ROA.2281 (Testimony of former Councilperson Schnyder) ("Q. Did Ms. Hotard disclose to you or the other members of the parish council that when she sponsored that agenda item, that she herself was facing an ethics complaint? A. No, she did not.").

comment."[121] Wright gaveled Banner to "stop speaking."[122] And then Wright read a section of a criminal law purporting to criminalize Banner's speech.[123]

Both Defendants Wright and Hotard conceded that they acted to silence Dr. Banner because of the <u>content</u> of her speech. For example, Wright admitted:

> Q.    Okay. So it was because of the content of what she was saying that you took the actions that you did; correct?
>
> A.    She was getting off topic, yes.[124]

And Hotard admitted:

> Q.    And you asked the chairman to stop Dr. Banner's comment because of the content of what Dr. Banner was saying; correct?
>
> A.    Because she was off topic, yes.
>
> Q.    So yes, because of the content?
>
> A.    Because she was off topic.
>
> Q.    Yes?
>
> A.    Yes.[125]

Defendants thus conceded that they were restricting Dr. Banner's speech

---

[121] ROA.2225 ("Q. But at one point, the parish president asked you to stop Dr. Banner's comment; correct? A. Yes.").

[122] *Id.* ("Q. And you expected her to stop what she was saying when you gaveled; correct? A. Yes. I expected all parties to stop speaking.").

[123] *See id.* ("Q. And then when you gaveled her quiet, you chose to read a section of a criminal law during Ms. Banner's public comment; correct? A. Yes.").

[124] ROA.2226.

[125] ROA.2275.

based on content, but argued that they were merely applying a neutral "on-topic" rule.

It is true that a government body may pass a rule requiring speakers during public comment at a meeting to remain on-topic. *See Chiu v. Plano Independent Sch. Dist.*, 260 F.3d 330, 354-355 (5th Cir. 2001). But at trial, Defendant Wright made an extraordinary admission about the off-topic rule he and Hotard pointed to. He conceded that the Parish Council had *never approved such a rule.*[126] Thus, he and Hotard were admittedly silencing Dr. Banner to enforce <u>a rule that did not exist</u>:

> Q.    Sure. When you gaveled her quiet, it was to enforce a rule that the parish has never formally adopted; agreed?
>
> A.    Correct.[127]

Given that the Open Meetings Law is judged by an objective standard, this is enough to grant a new trial. There is no way to rationally conclude Defendants complied with the public comment requirement of the Open Meetings Law if they stopped Dr. Banner's public comment to enforce a rule that did not exist.

---

[126] ROA.2217 (Wright Testimony) ("Q. Right. And the parish council votes on its own rules; correct? A. Yes."); ROA.2220 ("Q. Okay. But the council has never voted on an on-topic rule, have they? A. They have not.").
[127] ROA.2405.

The evidence was also more than enough to grant a new trial on the First Amendment discrimination claim.[128] "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."[129] One exception, however, is that in a limited public forum a government may approve and apply reasonable time, place, and manner restrictions to speech, so long as the restriction does not discriminate against speech on the basis of viewpoint.[130]

Here, Defendants Wright and Hotard both conceded that they were regulating Dr. Banner's speech based on content – and also that the Parish had *not* adopted the reasonable time, place, and manner restriction they invoked. Thus, Dr. Banner proved the content-based element of her claim, and disproved Defendants' on-topic-rule defense.[131]

There was also abundant evidence of the subjective intent required by Dr. Banner's First Amendment retaliation claim. For example, the statute that Wright read had been declared unconstitutional on its face nine years earlier. Wright was on notice of that fact, given that the piece of paper he was reading from "had the word

---

[128] Viewpoint discrimination is a kind of content-based discrimination claim. *See Matal v. Tam*, 582 U.S. 218, 248 (2017) ("A law found to discriminate based on viewpoint is an 'egregious form of content discrimination,' which is 'presumptively unconstitutional.'").

[129] *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

[130] *Heaney v. Roberts*, 846 F. 3d 795, 801-802 (5th Cir. 2017)

[131] *See Boos v. Barry*, 485 U.S. 312, 321 (1988) ("content-based restriction[s] on political speech in a public forum" subject to "most exacting scrutiny").

'unconstitutional' at the top of it."[132] But he did not disclose to anyone in the room that the paper had the word "unconstitutional" at the top.[133]

Plaintiff also showed at trial that President Hotard had a motive to silence her. Plaintiff's ethics complaint had been about Hotard's family's financial interest in a rezoning decision that the president signed off on. At trial, Hotard's mother-in-law testified that a family-owned LLC owned thin strips of land that controlled the rail access to the $800 million industrial project that would benefit from the rezoning.[134] The mother-in-law agreed that controlling that rail access could increase the value of the land – "if it was zoned right."[135]

The evidence at trial showed that the financial benefit to Hotard's family was even closer than her mother-in-law: President Hotard's own husband had an interest in the land that would increase in value if Hotard's rezoning application went

---

[132] ROA.2228 ("Q. So this piece of paper had the word "unconstitutional" at the top of it; is that correct? A. Yes.")

[133] ROA.2229 ("Q. Okay. And given that, it's a true statement that you did not disclose to anyone in the room, whether council members, the public, or Dr. Banner, that the piece of paper had the word "unconstitutional" at the top; agreed? A. Agreed.")

[134] ROA.2233 ("Q. Thank you. And there was to be a rail extension that would go right through those thin strips that you own; correct? A. That's my understanding of it. Q. So for this industrial project to proceed, the corporation
would either have to buy your company's land or pay for a right of way; correct? A. Yeah.")

[135] *Id.* ("Q. And owning a strip of land that controls the rail approach to an $800 million industrial project can increase the value of that land; agreed? A. Yeah, if it was zoned right."); *see also* ROA.2246 ("Q. Thank you. And the value of that land would have increased if the rezoning were approved; correct? A. Correct. Q. And you co-own that company with two family trusts; correct? A. Yes, I do.")

through.[136] It was admitted that this was a complete "secret" until Hotard's mother-in-law was required to disclose the information in discovery.[137]

This evidence provided background for the direct evidence at trial of Hotard's animus towards Dr. Banner. For example, Hotard's text messages showed Hotard saying "she wanted to choke Joy Banner,"[138] calling Dr. Banner "the bitch,"[139] and indicating that she felt "hate" for Joy Banner.[140]

There was also evidence of a pattern of President Hotard using her government powers to try to retaliate against Dr. Banner's speech. For example, Hotard had instructed her Director of Communications, Baileigh Helm, to "cancel all advertising" with a newspaper that printed a letter to the editor from Dr. Banner.

And then, just a few weeks before the November 2023 meeting, Hotard texted that she was "still steaming pissed" and "mad." She explicitly indicated that she

---

[136] ROA.2251 ("Q. Now Mr. Most is making a point of your son being a beneficiary of some of the holdings that Gaumet has. Explain to the jurors what is his percentage interest as a beneficiary. A. His percentage is one-third of 25 percent that he — that his father had which is 8.3 percent").

[137] ROA.2249 ("Q. Okay. Do you see in your deposition you were asked, 'So that's been a secret until today?' And your answer was, 'It's been a secret until you all — until the judge ruled I had to give it to you, yes'? A. Yes, that's correct.").

[138] ROA.2237 ("Q. So your understanding of the text message was that Ms. Hotard was saying she wanted to choke Joy Banner; correct? A. It was my understanding, yes.").

[139] ROA.2237 ("Q. And you understood Ms. Hotard, when she said "the bitch," to mean Joy Banner; correct? A. I'm guessing that's what she meant.").

[140] ROA.2244-2245 ("Q. When Ms. Hotard wrote, "I hate these people," you understood her to be referring to Joy Banner and her sister; correct? A. I understood it to be the situation going on, yes. Q. Specifically, "these people," being Joy Banner and her sister; correct? A. Descendants and Joy Banner, yes, her sister.").

wouldn't let Dr. Banner talk about the ethics issue: she said she would accept "anything, but to let them say I violated the ethics code."[141] In other words, there was documented evidence of President Hotard's subjective intent to stop Dr. Banner from speaking about the ethics violation.

It is quite rare to obtain this kind of evidence of a First Amendment violation: a government official putting in writing in advance their intent to stop someone from speaking about a particular topic, and then video of that plan put into action by means of a threat of imprisonment under an unconstitutional statute.

The trial court's response to this evidence was cursory: the trial court wrote that based on the juror's statement in the newspaper "the Court concludes that . . . the jury's verdict was reasonably supported by the evidence."[142] The trial court did not look to anything other evidence besides that single item – which is barred by Rule 606 – to analyze whether the jury's verdict was supported by the evidence.

Whether viewed from an objective point of view (per the Open Meetings Law claim and the First Amendment content-based discrimination claim) or a subjective point of view (per the First Amendment retaliation claim), Plaintiff's evidence was overwhelming. For that reason, this Court should remand for a new trial.

---

[141] ROA.2238. Emphasis added.
[142] ROA.2609.

## <u>CONCLUSION</u>

Jury trials are always unpredictable. But here, given the weight of evidence presented at trial, the jury's verdict was particularly surprising.

Putting Dr. Banner's two reasons for granting a new trial (defense counsel misconduct and the weight of evidence in plaintiff's favor) together may explain the verdict. Despite the evidence in Dr. Banner's favor, defense counsel's dozens of rule violations and evidentiary violations created confusion amongst the jurors. Indeed, the quotation of one juror in the newspaper suggests the jurors were in fact confused and applied the wrong legal standard to the facts.

It was error for the trial court to deny the motion for a new trial for several reasons: (1) because of the pervasive misconduct of defense counsel at trial; (2) because the trial court relied solely on a single piece of unsworn double hearsay, prohibited by Fed. R. Evid. 606, to conclude that defense counsel's misconduct did not materially affect the outcome of the trial; and (3) because of the weight of evidence in Dr. Banner's favor.

Given the cumulative nature of all the points above, it cannot be said "with fair assurance" that the jury's judgment was untainted by defense counsel's violations. Accordingly, this Court should remand for a new trial.

Respectfully submitted by,

*/s/ William Most*
William Most (No. 36914)
David Lanser (No. 37764)
MOST & ASSOCIATES
201 St. Charles Ave, Ste. 2500, # 9685
New Orleans, LA 70170
Telephone: (504) 509-5023
williammost@gmail.com

*Counsel For Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that today, October 6, 2025, a copy of the brief for appellee, Joy Banner, was served via electronic filing with the Clerk of Court and all registered ECF users by using the CM/ECF system.

*/s/William Most*
William Most
*Counsel For Plaintiff-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 28(b) and Fifth Circuit Court of Appeal Local Rule 32.3, undersigned counsel certifies that:

1.　　This brief complies with the type-volume limitation of F.R.A.P. 32(a)(7)(B) because it contains 11,901 words on 50 pages, excluding parts of the brief exempted by F.R.A.P. 32(f).

2.　　This brief complies with the typeface requirements of F.R.A.P. 32(a)(5) and the type style requirements of F.R.A.P. 32(a)(6) because this brief has been prepared in Microsoft Word using 14-point Equity font.

*/s/ William Most*
William Most
*Counsel For Plaintiff-Appellant*
